**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **JEREMY PARADISE,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 10-11678-FDS |
| ) | |
| **EAGLE CREEK SOFTWARE SERVICES,** ) | |
| **INC. and KENNETH C. BEHRENDT,** ) | |
| ) | |
| Defendants. ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND**
**ORDER COMPELLING ARBITRATION**

**SAYLOR, J.**

This is a contract dispute involving the alleged failure to pay certain commissions. Jurisdiction is based on diversity of citizenship. Plaintiff Jeremy Paradise is a former employee of Defendant Eagle Creek Software Services, Inc. He has brought suit against Eagle Creek and his former supervisor, Kenneth Behrendt. Paradise contends that defendants failed to pay him certain commissions due to him under his employment agreement. He also alleges violations of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149 § 148.

A threshold issue is whether the dispute should be arbitrated. Pursuant to 9 U.S.C. § 4, the limited issue of whether there is a valid contractual agreement to arbitrate was tried to the Court in a bench trial on July 23, 2013. The parties each submitted proposed findings of fact and conclusions of law. For the reasons set forth below, the Court finds that there is an enforceable agreement to arbitrate, and will issue an order compelling arbitration.

I.  **FINDINGS OF FACT**

   A.  **Background**

   1.  In the summer of 2007, plaintiff Jeremy Paradise was employed by Green Beacon Solutions, LLC. (Def. Tr. Ex. 65). As part of his job responsibilities, Paradise worked on a joint project with defendant Eagle Creek for 3Com. (Paradise Tr. Testimony, July 23, 2013).[1]

   2.  As an employee of Green Beacon, Paradise signed an agreement concerning ownership and disclosure of proprietary information, ownership of developments and inventions, non-competition, non-solicitation, and appropriate venues and governing law in the event of a dispute. (Pl. Tr. Ex. 62).

   3.  Paradise ended his employment with Green Beacon on September 28, 2007. (Def. Tr. Ex. 65).

   4.  At some point during the summer of 2007, Paradise and Eagle Creek employee Bob Dillon began discussing the possibility that Paradise would leave his position with Green Beacon to work for Eagle Creek.

   5.  Defendant Kenneth C. Behrendt is the founder, president, and CEO of Eagle Creek. Behrendt also met with Paradise in the summer of 2007, and participated in creating a position, salary class, and compensation plan for Paradise. (Pl. Tr. Ex. 84).

   6.  Beginning in July 2007, the parties exchanged a number of e-mails about the

---

[1] As of the date of this opinion, an official transcript of the bench trial has not yet been prepared. Accordingly, the Court will cite the testimony at trial without identifying any page numbers.

terms of the plan.

## B. Eagle Creek's Offer of Employment

7. Anthony Carter was the Eagle Creek recruiting specialist tasked with overseeing the hiring of Paradise. (Pl. Tr. Ex. 2).

8. On August 15, 2007, Carter sent Paradise an e-mail with the subject line "Eagle Creek Offer Letter and accompanying documents." (Pl. Tr. Ex. 8). Carter indicated that he had attached an "Offer Letter, Employment Agreement, EC Computer Agreement, ADP Application, and ADP Release Form." He instructed Paradise to "sign and date where needed and fax back all of the pages." (*Id.*).

9. The "Offer Letter" attached to the e-mail indicated that it "outlines [Eagle Creek's] offer," which was valid until August 18. (*Id.*). The letter included the sub-headings "Job Description," "Office Location," "Responsibilities," "Compensation," "Review," "Benefits," and "Start Date."

10. Under the heading "Responsibilities," the August 15 offer letter stated:

> Eagle Creek treats information, such as prospect and customer contacts, vendor contacts, key third party contacts, sales reporting etc. as a proprietary corporate asset. It is therefore, a requirement of the position to keep this information confidential. It is also a condition of employment [that] the Employment Agreement (see attached) is signed by you prior to joining Eagle Creek.

(*Id.*). The letter ended by stating:

> [f]rom all of us at Eagle Creek, we look forward to you joining the company. If you have any questions, please do not hesitate to contact me. If you agree with this offer, please sign at the indicated space below and return it to my attention.

(*Id*.).

11. Paradise did not sign and return the offer letter by August 18, 2007.

12. Due to an error, the document referred to as the "Employment Agreement" was not, in fact, attached to the August 15 e-mail.

13. On August 22, 2007, Carter e-mailed Paradise to ask whether he had "by chance accepted the EC offer." (Pl. Tr. Ex. 9). Paradise responded that he had "verbally accepted" the offer, and inquired as to whether there was "anything else [he] need[ed] to do." (*Id*.). Carter responded that he would send an updated offer letter and notify HR. (*Id*.).[2] He also stated that he "need[ed] the Application, ADP Release Form, Employee Property Agreement document, and Non Compete completed and faxed back to [him]." (*Id.*).

14. When he asked for the "Non Compete" to be completed and faxed back to him, Carter was referring to the "Employment, Non-Competition, and Confidentiality Agreement" ("the ENCCA"), the same document he had previously referred to as the "Employment Agreement."

**C.    Terms of the Employment, Non-Competition, and Confidentiality Agreement**

15. The ENCCA is a ten-page document. (Pl. Tr. Ex. 12).

16. Among other things, the first page of the ENCCA states that "the parties agreed prior to the [e]mployee's employment that this [a]greement must be executed as a condition to [e]mployee's beginning employment with [e]mployer and to

---

[2] There is no evidence in the record that an updated offer letter was actually sent, either on August 22 or at any point thereafter.

4

acknowledge [e]mployee's understanding of [e]mployee's employment." (*Id.*).

17. The ENCCA includes several sections, labeled as follows: (1) "Employee's Duties"; (2) "At-Will Employment"; (3) "Compensation and Benefits"; (4) "Expenses"; (5) "Nondisclosure of Confidential Information"; (6) "Inventions"; (7) "Return of Company Property"; (8) "Restrictive Covenants," including sub-sections "Non-Competition," "Anti-Piracy," "Non-Solicitation of Employees," and "Acknowledgment"; (9) "Affirmative Disclosure Obligation of Existence of Agreement"; (10) "Injunctive Relief"; (11) "Compliance Information"; (12) "Arbitration"; (13) "Entire Agreement"; (14) "Governing Law/Forum Selection"; (15) "Notices"; (16) Severability"; (17) "Judicial Modification of Agreement"; (18) "Survival"; (19) "Waiver"; (20) "Successors and Assigns"; and (21) "Employee's Ability to Enter Into Agreement." (*Id.*).

18. The "Arbitration" section of the ENCCA provides as follows:

> Except with respect to the provisions of Section 5 or 8 (including all subsections), any claims or disputes of any nature between or among the parties hereto arising from or related to this [a]greement or the performance, breach, termination, expiration, application or meaning of this [a]greement or any matter related to the [e]mployee's employment and the termination of that employment by the [c]ompany shall be resolved exclusively by arbitration conducted in Minneapolis, Minnesota, in accordance with the then-applicable rules of the Commercial Arbitration Rules of the America Arbitration Association, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction, except as modified by mutual agreement of the parties . . . . No punitive, special, or exemplary damages shall be sought by a party or awardable by the arbitrator(s).

(*Id.*).

5

19. The copy of the ENCCA provided to Paradise identified him by name as the "employee" on both the first and last pages, and indicated that it was to be effective as of August 15, 2007, the same day as his offer letter. (*Id.*).

**D.    Paradise's Acceptance of Eagle Creek's Offer of Employment**

20. There is no evidence of any communication between Paradise and Eagle Creek between August 22 and September 26, 2007.

21. On September 26, Paradise faxed a signed copy of the August 15 offer letter to Eagle Creek. (Pl. Tr. Ex. 11).

22. Also on September 26, Paradise asked Carter to send him a copy of the ENCCA. (Def. Tr. Ex. 40). Carter did so the same day, and apologized about not sending it previously. (Pl. Tr. Ex. 12). He told Paradise to "sign and fax [the ENCCA] back to [him]." (*Id.*).

23. On September 28, Paradise sent a six-page fax to Eagle Creek. Pages one through four of the fax consisted of his credit card application. Page five was the first page of the ENCCA. Page six was a credit card policy statement signed by Paradise. (Pl. Tr. Ex. 29).

24. Paradise did not return a signed copy of the ENCCA, or a signed copy of the signature page, to Eagle Creek at any point prior to beginning employment with the company.

25. In his testimony at trial, Paradise claimed that he made a conscious decision not to sign and send back the ENCCA because the intellectual-property clause was overly broad. (Paradise Tr. Testimony, July 23, 2013). However, in his initial

complaint, Paradise alleged that he could not remember whether he had signed the ENCCA. (Am. Compl. ¶ 23). And after Eagle Creek expressed its desire to arbitrate this dispute, Paradise submitted an affidavit in this proceeding indicating that he was "quite certain" he had not signed the ENCCA. (Docket. No. 29 at ¶ 4).

26. There was substantial evidence at trial that Paradise has been untruthful on multiple occasions concerning his employment history and education history. (Paradise Tr. Testimony, July 23, 2013). Among other things, Paradise lied in his resume about having received a college degree, and subsequently misrepresented the length of his employment with Eagle Creek. (Paradise Tr. Testimony, July 23, 2013).

27. Paradise's testimony concerning the circumstances of his failure to sign the ENCCA is not credible.

28. Paradise knew and understood that his employment was conditioned upon his agreement to the terms of the ENCCA.

29. Paradise expected to be bound by the terms of the ENCCA as to his employment with Eagle Creek.

30. Paradise never raised any question, objection, or concern concerning the ENCCA to anyone at Eagle Creek.

31. Paradise never expressed his intention not to be bound by the ENCCA to anyone at Eagle Creek.

32. It is unclear why Paradise did not sign and return the ENCCA, or its signature

page, to Eagle Creek; he either failed to do so inadvertently (intending nonetheless to be bound by the contract) or deliberately. If he did so deliberately, it was not because he disagreed with its terms, and intended in good faith to try to negotiate a different contract; he made no subsequent effort to negotiate or even discuss different terms.

33. Regardless of his reasons for failing to send back a signed agreement, Paradise knew and understood that Eagle Creek believed at all times that his employment was subject to the ENCCA. During his employment, Paradise did not say or do anything to suggest the contrary.

34. Under the circumstances, it was not reasonable for Paradise to assume or believe that Eagle Creek did not consider the ENCCA to be in effect. It was also unreasonable for Paradise to assume or believe that Eagle Creek had waived any of the terms of the ENCCA.

35. An employee of Eagle Creek named Jeaneen Wilhelmi, after receiving the September 28 fax from Paradise, checked a box on the company's personnel form indicating that a signed copy of the ENCCA had been received. In doing so, she was mistaken; the company had not received such a document.

36. A contributing cause to the mistake, if not the only cause, was the form of the six-page fax sent by Paradise on September 28, in which he sent the first page of the ENCCA followed immediately by the signature page to a different document.

37. Paradise began employment with Eagle Creek on October 1, 2007.

38. Paradise remained employed by Eagle Creek until he was terminated by the

    company on September 21, 2010.

39. Eagle Creek reasonably relied on the conduct of Paradise, including his silence, in believing that he had agreed to the terms of the ENCCA prior to the start of his employment.

## II.  CONCLUSIONS OF LAW

Plaintiff contends that the arbitration clause in not enforceable against him for two reasons. First, he contends that there was no valid and binding arbitration clause in effect between the parties. Second, he contends that even if there was a valid arbitration clause, it cannot be enforced because it would limit plaintiff's ability to recover all the remedies to which he is entitled under the Massachusetts Wage Act, in violation of Mass. Gen. Laws ch. 149 §§ 148, 150. The Court will address plaintiff's second argument first.

### A.  Arbitrability of Plaintiff's Massachusetts Weekly Wage Act Claim

1. The "'gateway dispute about whether the parties are bound by a given arbitration clause' is an issue for judicial resolution." *Dixon v. Perry & Slesnick,* P.C., 75 Mass. App. Ct. 271, 272 (2009) (quoting *Feeney v. Dell Inc.*, 454 Mass. 192, 198-99 (2009)).

2. Disagreements about "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" are one type of such gateway dispute. *See Kristian v. Comcast Corp.*, 446 F.3d 25, 39 (1st Cir. 2006).

3. Plaintiff asserts a claim under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149 §§ 148, 150.

4. The Massachusetts Wage Act requires employers to pay all wages due to

9

employees promptly.  *Dixon*, 75 Mass. App. Ct. at 273.  It further provides that "[n]o person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty."  Mass. Gen. Laws ch. 149 § 148.  Pursuant to § 150, an employee who is successful in his or her suit under the act may recover, among other things, an award of treble damages and attorney's fees.  *Dixon*, 75 Mass. App. Ct. at 273.

5. "An agreement to circumvent the Wage Act is illegal even when 'the arrangement is voluntary and assented to.'"  *Melia v. Zenhire, Inc.*, 462 Mass. 164, 171 n.8 (2012).  An arbitration provision that circumvented the Wage Act would therefore be unenforceable.

6. Thus, the question of whether plaintiff's claim under the Massachusetts Wage Act is arbitrable is one for this Court, and not for the arbitrator.

7. The language of the Massachusetts Wage Act "does not operate as a *per se* bar to the arbitration of a Wage Act claim."  *Dixon*, 75 Mass. App. Ct. at 275.  Whether a particular claim may properly be arbitrated must be determined according to a case-specific analysis.

8. The arbitration provision at issue in this case does not allow for the award of "punitive, special, or exemplary damages."  (Pl. Tr. Ex. 12).

9. "[B]ecause the award of treble damages is mandatory under Mass. Gen. Laws ch. 149 § 150, and cannot be waived," an arbitration provision that compels an employee to forego that right must be invalidated.  *Machado v. System4 LLC*, 465 Mass. 508, 517 (2013).

10. However, where the terms of an agreement allow for severance, the "offending term can be severed . . . while preserving the arbitral forum." *Id*. at 517-18.

11. The ENCCA includes a "Severability" provision that provides that, in the event any provision is held invalid, the remaining provisions of the agreement continue to be enforceable. (Pl. Tr. Ex. 12).

12. The Court will accordingly sever the term in the ENCCA that purports to waive multiple damages, which term the Court finds to be invalid. Absent that waiver, the arbitration provision will be enforceable with respect to plaintiff's Massachusetts Wage Act claim.

13. In his proposed findings of facts and conclusions of law, plaintiff argues for the first time that the forum selection clause of the ENCCA is also unenforceable because it would deprive him of his right to treble damages. Having not been raised in the complaint, at trial, or in any of plaintiff's earlier briefs, that argument is deemed waived.

14. Plaintiff has presented no evidence that the Minnesota choice-of-law rules would select a law other than that of Massachusetts, or that the remedies available in a Minnesota forum would result in a loss of a substantive right guaranteed by the Massachusetts Wage Act. "Nowhere does the text of the Wage act . . . guarantee venue in a Massachusetts court." *Melia v. Zenhire, Inc.*, 462 Mass. 164, 171-72 (2012).

15. Accordingly, plaintiff has presented no evidence that the forum selection clause interferes with plaintiff's rights under the Massachusetts Wage Act, and thus the

forum selection clause does not render the arbitration provision unenforceable.

**B.** **Existence of Valid Agreement to Arbitrate**

16. Section 4 of the Federal Arbitration Act allows a party to petition a federal district court to compel arbitration in accordance with a preexisting agreement. *Campbell v. General Dynamics Corp.*, 407 F.3d 546, 552 (1st Cir. 2005).

17. The Federal Arbitration Act places arbitration agreements on "the same footing as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974). However, it "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Board of Trs. Of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989).

18. To compel arbitration, defendants must establish that "'a valid agreement to arbitrate exists, that [they are] entitled to invoke the arbitration clause, that [Paradise] is bound by that clause, and that the claim asserted comes within the clause's scope." *Campbell*, 407 F.3d at 552 (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 141 (1st Cir. 2003)).

19. In general, "principles of state contract law control the determination of whether a valid agreement to arbitrate exists." *Id*.

20. In some instances—in particular, those in which a party relies on the FAA to arbitrate a claim arising from a federal employment discrimination statute—courts engage in a supplemental inquiry as to whether arbitration is "appropriate" under the statute at issue. *Id*. In such cases, the courts have found that enforcement of an arbitration provision is only appropriate where the agreement to arbitrate was

"clear and unmistakable." *Id.* (citing *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 82 (1998)).  However, because this case does not involve a claim arising from a federal employment discrimination statute, the Court need not engage in this "supplemental inquiry."  There is no requirement here that the agreement to arbitrate be "clear and unmistakable."

21. At this stage, the Court draws no conclusion as to what state's substantive law—Minnesota or Massachusetts—will ultimately control.

22. Under both Massachusetts and Minnesota law, the formation of a contract requires a definite offer, acceptance, and consideration.  *State v. Rodriguez*, 775 N.W.2d 907, 910 (Minn. Ct. App. 2009); *Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009).

23. Formation of a contract is judged by the objective conduct of the parties, rather than their subjective intent.  *Hill v. Okay Const. Co., Inc.*, 312 Minn. 324, 332 (1977); *Brewster Wallcovering Company v. Blue Mountain Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 596 n.35 (2007).

24. A contract may be binding on an employee in the context of an at-will employment relationship even if the agreement is not express and in writing.  *See, e.g., Ellerbee v. Gamestop, Inc.*, 604 F. Supp. 2d 349, 354 (D. Mass. 2009) (citing *O'Brien v. New England Telephone Co.*, 422 Mass. 686, 691 (1996)).

25. Defendant made a definite offer of at-will employment on August 15, 2007.

26. Defendant outwardly manifested an intent to incorporate the terms of the ENCCA in its offer by conditioning employment on acceptance of the terms of the

agreement, and by repeatedly requesting that plaintiff sign and return the agreement.

27. Although defendant's offer specified that it was valid for three days, an offeror who has specified an expiration for its offer may indicate a willingness to stand by the terms of the offer past the stated expiration date. 1 Williston on Contracts §5:5 (4th ed.). "Any such manifestation of continued willingness on the part of the offeror will extend the time during which acceptance may occur, constituting in effect a new offer, which may be accepted and if so accepted will ripen into a contract." *Id.*

28. Defendant manifested a continued willingness to allow plaintiff to accept the offer when it proceeded with negotiations following the expiration of the initial offer.

29. Plaintiff outwardly manifested his acceptance of that offer on September 26, 2007, when he returned a signed copy of the offer letter. In so doing, he manifested an intent to be bound by the agreement, including the portion that indicated that it was a condition of his employment that he sign and return the ENCCA. He made no attempt to limit the terms to which he was agreeing, or to raise any objection, question, or concern regarding the incorporation of the ENCCA.

30. At the time, given defendants' clear expression of the expectation that the ENCCA was incorporated into the offer, plaintiff understood or reasonably should have understood that the terms of the ENCCA were incorporated into his contract. Plaintiff nonetheless outwardly manifested his acceptance to those terms.

31. Even if plaintiff had not read the ENCCA at the time he signed and returned the offer letter, he outwardly manifested his agreement to its terms. On the same day that he signed an offer letter that explicitly indicated that his employment was conditioned on acceptance of the ENCCA, plaintiff requested a copy of that agreement. He did not raise any objections to the terms of that agreement at any time between receiving the agreement and beginning employment on October 1, 2007. Because plaintiff had signed an offer letter that provided clear notice that his employment was conditioned on acceptance of the ENCCA, he had a duty to object if he did not accept the terms of the ENCCA.

32. Plaintiff cannot avoid his obligations by arguing that the ENCCA was not binding until he signed it. Both the offer letter and his communications with Anthony Carter made it clear that the ENCCA was a crucial part of the agreement between the parties.

33. While it is true that the offer letter indicated that it was a condition of plaintiff's employment that he *sign* the ENCCA, he does not argue that his failure to sign prevented the formation of a contract. Indeed, plaintiff is suing to enforce the terms of the contract. Rather, he argues that he interpreted the requirement as being waived.

34. Under the circumstances, there is no reasonable basis for interpreting defendant's conduct as manifesting an intention to waive the terms of the ENCCA.

35. Plaintiff's conduct on September 28, 2007, including faxing the first page of the ENCCA and the signature page of a different document, and his failure to object

    to any of the terms of the ENCCA, also constituted an outward manifestation of the acceptance of the ENCCA.

36.  The parties' conduct after September 28, 2007, including plaintiff's silence and defendants' failure to make further inquiry to him concerning the absence of his signature on the ENCCA, also constituted an outward manifestation of the fact that the parties intended to be bound by the terms of the ENCCA.

37.  Each side offered valid consideration for the contract.

38.  Accordingly, a valid and enforceable contract was formed between the parties.

39.  That contract incorporated, among other things, the terms of the ENCCA.

40.  Paradise is bound by the arbitration clause set forth in the ENCCA.

41.  The claims asserted in this case come within the clause's scope.

42.  Where an employee's claims against both his employer and the principal of his employer are "inextricably intertwined," the employee can be compelled to arbitrate claims against both defendants, even if the principal was not a signatory to the arbitration agreement. *Myrick v. GTE Main Street, Inc.*, 73 F. Supp. 2d 94, 96-97 (D. Mass 1999) (citing *Paul Revere Variable Annuity Ins. Co. v. Thomas*, 66. F. Supp. 2d 217, 225 (D. Mass 1999). Accordingly, the claims against Behrendt are subject to arbitration to the same extent as the claims against Eagle Creek.

43.  Defendants are entitled to an order compelling arbitration.

### III.  Conclusion

The Court finds, for the reasons stated above, that there is a valid contractual agreement

16

to arbitrate plaintiff's claims.  Accordingly, the Court ORDERS that the parties submit their claims to arbitration as required by their agreement.

**So Ordered.**

|  |  |
|---|---|
| Dated: September 6, 2013 | /s/ F. Dennis Saylor<br>F. Dennis Saylor IV<br>United States District Judge |